Erin Rose Ronstadt, SBN 028362
Clayton Warren Richards, SBN 029054
OBER PEKAS RONSTADT
3030 N. 3rd Street, Suite 1230
Phoenix AZ 85012
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oberpekas.com
clayton@oberpekas.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carlotta Lee Ruble, | No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| United Services Automobile Association Comprehensive Welfare Benefits Plan, an ERISA benefit plan; Liberty Life Assurance Company of Boston, a plan fiduciary; the Executive Vice President of People Services of the United Services Automobile Association, plan administrator; | |
| Defendants. | |

For her claims against the United Services Automobile Association Comprehensive Welfare Benefits Plan ("the Plan"), an ERISA benefit plan; Liberty Life Assurance Company of Boston ("Liberty"), claims administrator and plan fiduciary; and USAA's Executive Vice President of People Services ("Plan Administrator"), a plan administrator (collectively, "Defendants"); Plaintiff Carlotta Ruble ("Ms. Ruble" or "Plaintiff") alleges as follows:

### *Jurisdiction, Venue, and Parties*

1.      This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2.      The Plan is a purported ERISA benefit plan established and maintained by USAA for the benefit of its employees.

3.      The Plan is comprised of "Constituent Benefits Programs," including the "USAA Long-Term Disability Benefit Program," to help ease the financial impact a long-term

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

1    illness or injury can have on an employee's life.

2    4.    USAA provides benefits under the LTD Program pursuant to an insurance policy

3    issued and fully insured by Liberty, identified as Policy No. GF3-891-419734-01 (the

4    "Policy").

5    5.    Ms. Ruble was a participant and beneficiary of the Plan as an employee of USAA.

6    6.    USAA is the Plan Sponsor and Ms. Ruble's former employer.

7    7.    USAA administered the Plan in Arizona to its employees, including Ms. Ruble.

8    8.    USAA's Executive Vice President of People Services is the Plan Administrator.

9    9.    According to the Summary Plan Description the Plan Administrator produced in

10   response to Ms. Ruble's request for Plan documents, the Plan Administrator may appoint

11   other Plan Administrators.

12   10.    In the absence of an appointment, pursuant to the Summary Plan Description,

13   USAA's Executive Vice President of People Services is the Plan Administrator.

14   11.    At the time Ms. Ruble sought LTD benefits under the Plan, Liberty administered

15   claims for USAA under the Plan, acted on behalf of the Plan, and acted as an agent of

16   USAA, the Plan Administrator, and/or the Plan to make final decisions regarding the

17   payment of disability benefits under the Plan and to administer the Plan.

18   12.    Liberty had actual or apparent authority to act as a fiduciary on behalf of the Plan.

19   13.    Liberty's third-party vendors had actual or apparent authority to act as fiduciaries on

20   behalf of the Plan and administered the Plan in providing services to Defendants.

21   14.    On information and belief, USAA has not properly conferred Liberty with the

22   discretionary authority to interpret the Plan or to make eligibility determinations regarding

23   the Plan.

24   15.    Liberty acted under a structural conflict of interest in both administering and paying

25   claims under the Plan.

26   16.    Liberty fully insures the Plan's long-term disability ("LTD") benefits.

27   17.    Liberty is a Plan fiduciary.

28   18.    The Plan Administrator, USAA, and Liberty have a duty to administer the Plan

prudently and in the best interests of all Plan participants and beneficiaries, including Ms. Ruble.

19.     Ms. Ruble is entitled to *de novo* review of her claims.

20.     Ms. Ruble currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

21.     The Plan and USAA have their principal places of business in the State of Texas.

22.     Liberty has its principal place of business in the Commonwealth of Massachusetts.

23.     Defendants Liberty and the Plan Administrator are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

24.     This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

25.     Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

## **GENERAL ALLEGATIONS**

### ***Ms. Ruble's Employment***

26.     USAA employed Ms. Ruble as a Claims Representative beginning in April 2007.

27.     Ms. Ruble excelled at USAA and routinely received merit increases to her pay during her employment.

28.     At the time of her Disability in 2017, Ms. Ruble was a Member Solutions Specialist.

29.     According to USAA's job description, a Member Solutions Specialist "[g]athers information and close[s] on product sales for a suite of services demonstrating advanced skills and knowledge of USAA products and benefits"; "[i]dentifies member events to provide integrated solutions on products and close on product sales that meet the members needs and facilitate the members financial security"; provides solutions for members to acquire a USAA product; and responds to and completes member requests; among other job duties.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

-3-

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

30.     The job description describes "Work Conditions" as taking place "in a professional office setting (e.g., Call Center, Financial Center, Home office) where work is conducted at a desk."

31.     In the last years of her employment with USAA, Ms. Ruble worked in the Consumer Lending department.

32.     In this capacity, Ms. Ruble worked out of her home.

33.     Her job included a "high level of customer contact" with "customer interaction" that "can be of a sensitive nature and stressful at times."

34.     The job included extended periods of sitting and answering phone calls from potential customers.

35.     According to USAA's own job description, the job involved knowledge, skills, or attributes, including finding innovative solutions to problems; "[a]cquir[ing] and demonstrat[ing] proficiency in applying advanced knowledge of products, services and processes"; "[a]cquir[ing] and demonstrat[ing] proficiency in applying advanced product acquisition and/or member service techniques"; "[c]omplet[ing] each activity in an accurate and timely manner"; "[c]onvey[ing] information and position clearly, concisely, logically and in an organized manner"; "[w]ork[ing] productively in the face of ambiguity or uncertainty"; and "[o]vercoming obstacles and constraints without becoming discouraged."

36.     Ms. Ruble's job required significant skills and advanced product knowledge.

### Plan Language

37.     During the Elimination Period and the first 24 months of a period of Disability, the Plan defines "Disability" or "Disabled" as the Covered Person's inability to perform, "as a result of Injury or Sickness . . . the Material and Substantial Duties of [the Covered Person's] Own Occupation . . .."

38.     After 24 months of Disability, the definition of Disability is the Covered Person's inability "to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation."

-4-

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

39.     The term "Own Occupation" is defined as "the Covered Person's occupation that [s]he was performing when [her] Disability or Partial Disability began."

40.     Under the Plan, Liberty considers the Covered Person's Own Occupation "as it is normally performed in the national economy."

41.     Under the Plan, "Material and Substantial Duties" are the "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified."

42.     Under the Plan, "Any Occupation" is "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity."

43.     A "Covered Person" is an "Employee insured under this policy."

44.     Ms. Ruble is a Covered Person under the Plan.

### Ms. Ruble's Disability

45.     Ms. Ruble first suffered a back injury in 2007, which necessitated a hemi-laminotomy in March 2008.

46.     Ms. Ruble medically improved, enabling her to return to work for about eight years.

47.     In December 2016, however, she experienced a resurgence of her severe low back pain.

48.     Diagnostic imaging confirmed a disc extrusion causing lumbar nerve root displacement and compression.

49.     In January 2017, Ms. Ruble underwent another hemi-laminotomy surgery at L4-5—the same level affected in 2007.

50.     Ms. Ruble stopped working on January 16, 2017 due to her Disability.

51.     Liberty initially approved short-term disability benefits effective January 17, 2017.

52.     Though Ms. Ruble again experienced temporary medical improvement, in March 2017, her symptoms returned.

53.     Ms. Ruble went to the emergency room for severe back pain in March 2017.

54.     During her visit, an MRI showed severe stenosis and "probable impingement" of

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

the nerve roots of the lumbar spine.

55.    A radiologist noted nerve root compression and displacement in the lumbar spine.

56.    During her hospital stay, a physical therapist prescribed to Ms. Ruble a quad-cane and assigned to her significant functional restrictions.

57.    On July 18, 2017, Liberty notified Ms. Ruble it was evaluating her claim for LTD benefits.

58.    During Liberty's review of the claim, a Lincoln Financial Group ("Lincoln Financial") medical consultant, Dr. Todd Hagle, contacted Ms. Ruble's orthopedic surgeon, Dr. Oner Khera.

59.    Dr. Khera warned that Ms. Ruble's prognosis after yet another surgery was "very guarded . . . due to potential for right L4-5 nerve root injury which could lead to permanent impairment."

60.    Dr. Khera explained Ms. Ruble would not be able to return to any meaningful work.

61.    Dr. Hagle assigned physical restrictions and limitations that would preclude even sedentary work.

62.    Ms. Ruble exhausted her short-term disability benefits under the Plan.

63.    On August 3, 2017, Liberty awarded Ms. Ruble LTD benefits effective July 16, 2017—her date of first entitlement to LTD benefits after a 180-day waiting period.

### Liberty's Denial of Benefits

64.    Dr. Hagle reviewed the claim again several months later at Liberty's behest, but he continued to endorse the Disabling limitations he assigned in July 2017 with a recommendation for reassessment in the future.

65.    In January 2018, Dr. Khera noted Ms. Ruble's pain had "returned fully."

66.    Dr. Khera stated Ms. Ruble had fully regressed to the point she was unable to stand or walk for significant periods of time.

67.    Dr. Khera described Ms. Ruble's pain as "very severe."

68.     Despite this regression, Liberty called for yet another review of Ms. Ruble's LTD claim—the third such review in a span of nine months.

69.     On April 13, 2018, Dr. Mukund Gundanna—a Liberty consultant—reviewed Ms. Ruble's LTD claim.

70.     Dr. Gundanna opined, despite the opinions of Drs. Hagle and Khera, and despite overwhelming medical evidence, there is "insufficient evidence of any actual impairment due to [Ms. Ruble's lumbar radicular syndrome.]"

71.     Dr. Gundanna noted that, aside from "pain" and "limited lumbar range of motion," there were "[n]o other measurable deficits . . . in the records to support that [Ms. Ruble] had any real functional impairment secondary to the subjective complaints and physical exam findings."

72.     Dr. Gundanna assigned to Ms. Ruble no restrictions or limitations whatsoever.

73.     Dr. Gundanna asserted Ms. Ruble had reached maximum medical improvement by October 19, 2017.

74.     Dr. Gundanna's opinion is contradicted by Dr. Khera's last available treatment note, dated January 2018, which Dr. Gundanna purported to review.

75.     In that note, Dr. Khera documented significant positive clinical findings.

76.     These findings are evident from Dr. Gundanna's own summary of the available medical evidence in his report.

77.     Moreover, Dr. Gundanna documented a conversation he had with Dr. Khera on April 23, 2018, during which Dr. Khera allegedly stated, "the claimant has already had [two] decompressions, and she is not interested in having surgery at this time. We discussed the possibility of a spinal cord stimulator trial."

78.     Dr. Gundanna stated, "[n]o other information was provided to support altering the determination."

79.     On information and belief, Dr. Khera did not endorse Ms. Ruble's return to work at that time because, a few months later, he completed an assessment for the Arizona Department of Economic Security concluding Ms. Ruble had not been able to work, she

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

must not lift weights over ten pounds, she must not drive while on medications, and she must sit or stand every five minutes or as needed.

80.     Dr. Khera noted in his July 2017 discussion with Liberty's prior consultant, Dr. Hagle, that he was "trying to avoid further fusion surgery" due to "concern[] about nerve root injury and permanent foot drop."

81.     On April 30, 2018, Liberty terminated Ms. Ruble's LTD benefits ("the Denial").

82.     Liberty terminated Ms. Ruble's LTD benefits before the end of the Own Occupation phase of Disability.

83.     Liberty fully relied upon Dr. Gundanna's opinion to support its termination of benefits.

84.     Notably, Liberty did not bother to obtain the evidence of Ms. Ruble's March 2017 hospitalization, which confirmed via diagnostic imaging a lumbar impairment with nerve root involvement which occurred after her most recent surgery from January 2017.

### Ms. Ruble's Appeal

85.     On October 26, 2018, Ms. Ruble timely appealed ("the Appeal").

86.     With the Appeal, Ms. Ruble submitted compelling new evidence, including the aforementioned hospitalization records that Liberty failed to procure, additional medical treatment records, a functional capacity evaluation ("the FCE"), and a vocational evaluation supporting Ms. Ruble's Disability from her Own Occupation or Any Occupation.

87.     The FCE concluded, for instance, Ms. Ruble is "UNABLE to perform the physical demands or material duties of her past work as a Customer Services representative which is rated as SEDENTARY work or ANY other work including other types of SEDENTARY work on a regular and consistent basis." (emphasis in original).

88.     The examiner gave Ms. Ruble a high rating for performance because her symptoms were consistent; she exhibited no inconsistencies in her weakness or strength, non-anatomic tenderness, unusual behaviors, excessive pain behaviors, or movement inconsistencies; she did not refuse to attempt any tests; and she did not over-estimate her safe limits.

89.     She passed all inherent validity measures of the testing.

90.     Ms. Ruble's FCE findings constitute reliable, objective evidence of her functional deficits and her resulting Disability from her Own Occupation or Any Occupation.

91.     The FCE examiner noted he strongly disagreed with Dr. Gundanna's conclusions.

92.     In the examiner's words, "To say that there are no restrictions and/or limitations supported by the record as [Dr. Gundanna] does . . . simply ignores Ms. Ruble's longstanding treatment record."

93.     In the vocational evaluation Ms. Ruble submitted with her Appeal, the vocational consultant concluded, "[Ms. Ruble] is competitively unemployable in any capacity at the sedentary/light level of work."

94.     The vocational consultant categorized Ms. Ruble's work for USAA as Telephonic Customer Service, which is "sedentary," "skilled" work.

95.     The vocational consultant noted Ms. Ruble's performance evaluations at USAA were "consistently positive."

96.     The vocational consultant observed Ms. Ruble ambulating "very slowly" and changing positions from sitting to standing "frequently throughout the entire vocational evaluation interview."

97.     The vocational consultant noted that, while standing, Ms. Ruble would have to lean on her chair to take pressure of her right leg.

98.     The consultant noted, "[f]rom a vocational standpoint, it would be very difficult to maintain computer input on a keyboard if one is standing and placing most of one's weight onto the left leg/foot. This is a very awkward position to be consistently productive on a keyboard or telephone."

99.     The consultant further noted Ms. Ruble's pain medications interfered with her thought processes.

100.    In her personal declaration submitted with the Appeal, Ms. Ruble described ongoing, debilitating, "constant pain" and other symptoms.

101.    She described the relief from her medications as only "minimal or temporary."

102.    She described significant side effects from her medications including slurred speech,

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

disorientation, and trouble completing sentences.

103.   Ms. Ruble noted that, on a "good day," household chores and activities that would take 10 to 15 minutes under normal circumstances, now take "roughly an hour."

104.   On "bad days," Ms. Ruble noted, her pain pills usually put her to sleep for three to four hours.

105.   Ms. Ruble stated she experiences bad days approximately three times per week.

106.   On those days, Ms. Ruble stated she is only able to get up to use the bathroom and let her dogs in and out of the house.

107.   Ms. Ruble described no longer being able to do the activities she used to since her Disability began, such as hiking with her sons.

108.   Despite this evidence, Liberty referred Ms. Ruble's claim to yet another internal consultant, Dr. Howard Grattan, during the Appeal.

109.   Despite reviewing evidence of Ms. Ruble's medical history, Dr. Grattan concluded Ms. Ruble—a 54-year-old woman with a history of two back surgeries and ongoing lumbar radiculopathy—could push or pull 50-pound weights for up to two and two-thirds hours of an eight-hour work day; lift or carry 35-pound weights for that same amount of time; sit without restriction; and stand or walk up to six of eight working hours combined.

110.   Dr. Grattan characterized Ms. Ruble's ongoing clinical findings as "very mild in severity."

111.   Dr. Grattan stated, "there are no updated imaging studies performed or provided for review," but he ignored the last imaging study from Ms. Ruble's March 2017 hospitalization, which showed nerve root compromise.

112.   Dr. Grattan ignored the FCE findings and misstated Ms. Ruble's medical history.

113.   Dr. Grattan also erroneously stated, "There are no reported cognitive and/or physical side effects attributed to medications." This statement is demonstrably false.

114.   On January 7, 2019, Liberty forwarded Ms. Ruble's file to vocational case manager Lori Ashworth.

115.   A Liberty internal note from the same day notes "[own-occupation] referral

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

completed and closed."

### *Liberty's Final Denial*

116.    The very next day, Liberty issued a 15-page Denial of Ms. Ruble's Appeal ("the Final Denial.")

117.    On information and belief, the Final Denial was drafted before Liberty received the results of the vocational report.

118.    Liberty never disclosed to Ms. Ruble Dr. Grattan's peer review report or Ms. Ashworth's report, in violation of federal regulations.

119.    In the Final Denial, Liberty once again fully relied on the opinion of its internal medical consultant, Dr. Grattan.

120.    In the Final Denial, Liberty never addressed Dr. Khera's July 2018 assessment which stated Ms. Ruble was not able to return to work.

121.    Ms. Ruble suffers from lumbar spondylosis, radiculopathy, and failed back surgery syndrome, among other impairments, which cause her Disabling functional limitations.

122.    Ms. Ruble cannot perform the Material and Substantial Duties of her Own Occupation or Any Occupation and, therefore, comes within the definition of Disability under the Plan.

123.    Ms. Ruble exhausted her administrative remedies and timely filed this lawsuit.

**COUNT I**
**(Recovery of LTD and other Plan Benefits)**
**(Defendants Liberty and the Plan)**

124.    All other paragraphs are incorporated by reference.

125.    The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

126.    The Plan represents LTD coverage and a promise to provide LTD benefits until Ms. Ruble is no longer Disabled under the terms of the Plan.

127.    Ms. Ruble continues to be Disabled from her Own Occupation or Any Occupation.

128.    Ms. Ruble has claimed the benefits under the Plan to which she is entitled.

**OBER PEKAS RONSTADT**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

129.     Ms. Ruble reasonably expected that her medical conditions met the requirements of Disability as defined by the Plan and that she would receive benefits under the Plan until she reaches age 65 or until she was no longer Disabled.

130.     Despite the coverage of Ms. Ruble's Disability, Liberty and the Plan improperly terminated her LTD benefits in breach of the Plan and ERISA.

131.     Liberty and the Plan did not acquire all of the relevant medical evidence, failed to properly consider the evidence it had, and ignored the opinions of Ms. Ruble's treating surgeon, the functional capacity examiner, and her vocational consultant.

132.     Liberty's and the Plan's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

133.     Liberty's and the Plan's physician consultants did not review all of the relevant medical evidence, failed to properly consider that evidence, or mischaracterized that evidence to reach the conclusion Ms. Ruble is not Disabled under the Plan.

134.     Liberty fully relied on the opinions of physician consultants it knew were misinformed.

135.     Dr. Grattan, for instance, erroneously stated, "[t]here are no reported cognitive and/or physical side effects attributed to [Ms. Ruble's] medications."

136.     Liberty failed to disclose the unfavorable evidence it solicited during the appeals process in violation of federal regulations. Federal regulation, 29 C.F.R. § 2560.503-1(h)(4)(i), provides, for instance, that claims procedures for disability benefits on review will not "be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless . . . the claims procedures— (i) Provide that before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person) in connection with the claim; such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse

-12-

benefit determination on review is required to be provided under paragraph (i) of this section to give the claimant a reasonable opportunity to respond prior to that date . . ..''

137.   Liberty and the Plan plainly failed to disclose Dr. Grattan's unfavorable report before issuing the Final Denial.

138.   Instead of evaluating a participant's eligibility based on the applicable plan language and medical evidence, Ms. Ruble is informed and believes that Liberty makes claims decisions based on the claims resources and financial risk it faces on certain claims.

139.   Liberty's reliance on erroneous medical reports is evidence of this.

140.   Liberty wrongfully denied Ms. Ruble's Disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

141.   Liberty did not properly consider all of the available evidence when terminating Ms. Ruble's benefits.

142.   Liberty failed to conduct a full and fair review.

143.   Liberty misstated medical evidence for its own financial benefit, *e.g.*, it excessively relied on biased medical reviews provided by in-house medical consultants.

144.   Liberty relied on findings that constitute "clearly erroneous findings of fact"—such as Dr. Gundanna's conclusion Ms. Ruble has no physical limitations whatsoever—to deny Ms. Ruble's benefits.

145.   In another example, Dr. Grattan, in his review of Ms. Ruble's claim on Appeal, completely ignored the original FCE report, stating only, "[a]lthough the claimant's function is below a sedentary category the claimant's physical findings throughout the documentation must also be considered and given the lack of any significant neurological deficits such as loss of strength, change in sensation, or any recent gait abnormalities is unclear why the claimant could not at least function with restrictions given the lack of neurological deficit or any gait abnormality."

146.   Dr. Grattan acknowledged the FCE and then essentially ignored it.

147.   Dr. Grattan also misstated Ms. Ruble's medical history.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-13-

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

148.     Dr. Grattan asserted there are no "ongoing neurological features" of Ms. Ruble's lumbar spinal impairment, but this is also clearly belied by the record.

149.     Lumbar radiculopathy, which Dr. Grattan agreed was a diagnosis supported by the medical evidence, *is the very existence* of nerve involvement of a disease process in the lumbar spine.

150.     Moreover, the last available medical imaging, which Dr. Grattan purported to review, confirms nerve root involvement.

151.     During the FCE, Ms. Ruble exhibited signs and symptoms consistent with nerve root involvement.

152.     In an addendum report attached to this complaint, the FCE examiner makes this clear.

153.     In the addendum report, the FCE examiner characterizes Dr. Grattan's summary of his report as "absurd and simply untrue." (Ex. 1.)

154.     The FCE examiner enumerated ten different types of clinical data undermining Dr. Grattan's summary conclusions.

155.     The FCE examiner characterized the restrictions and limitations Dr. Grattan assigned as "completely fabricated" and belied by the medical evidence.

156.     Liberty abused its discretion by basing its decision on unreliable and inaccurate information. When confronted with this knowledge, Liberty ignored the inaccuracies or created new reasons for denial.

157.     Upon information and belief, Liberty tainted its medical file reviewers by giving the reviewers inaccurate information regarding Ms. Ruble while also failing to provide its reviewers with all of the relevant evidence, such as the personal statements of Ms. Ruble and her family members.

158.     Upon information and belief, Liberty provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

159.     Liberty routinely emphasizes information that favors a denial of benefits while

-14-

deemphasizing other information that suggests a contrary conclusion.

160.    Liberty and the Plan Administrator unreasonably withheld relevant documents throughout the entire claim and poorly managed the file, which is evidenced, in part, by its repeated failure to provide all relevant documents.

161.    Though the Plan Administrator disclosed certain documents to Ms. Ruble in response to her request, the Plan Administrator did not disclose the actual written plan document. *See* 29 U.S.C. §§ 1102(a), 1132(c)(1).

162.    Liberty's and the Plan Administrator's failure to comply with ERISA's disclosure requirements and poor management of the file demonstrate its abuse of discretion and improper claims handling.

163.    Liberty failed to properly consider the opinions of Ms. Ruble's treating and examining physicians.

164.    In terminating Ms. Ruble's LTD benefits, Liberty completely disregarded evidence that Ms. Ruble's conditions had not changed or improved.

165.    Liberty has no evidence that Ms. Ruble's conditions changed or improved since it determined that she met the definition of Disabled from her Own Occupation in the Policy.

166.    Liberty intentionally gathered evidence to stack the deck in its favor and against Ms. Ruble.

167.    Upon information and belief, Liberty used in-house reviewers in evaluating Ms. Ruble's claim, because it knew that the in-house reviewers' recommendations would be unfavorable for the continuation of Ms. Ruble's benefits.

168.    Dr. Grattan, for instance, is a known insurance company consultant.

169.    District Courts have criticized Dr. Grattan's reports where, as here, Dr. Grattan summarizes medical records at length, but scarcely provides any analysis of the records he purported to review in his conclusions. *Brainard v. Liberty Life Assurance Co. of Boston*, 173 F. Supp. 3d 482, 491-92 (S.D. Ky. 2016); *Thoma v. Fox Long Term Disability Plan*, No. 17 Civ. 4389, 2018 WL 6514757 (S.D.N.Y. Dec. 11, 2018).

170.    In *Brainard*, the Court noted Dr. Grattan summarized his review of medical records

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

in 11 pages, but his analysis of those records "is hardly half a page in length." *Id.* at 492.

171.   Here, as in *Brainard*, Dr. Grattan summarized medical records at length, but failed to analyze them or use them to explain the conclusions he reached.

172.   Likewise, in *Thoma*, the Court noted Dr. Grattan's report "offered little by way of substantive analysis, particularly any discussion as to why his opinion differed from the opinion of other evaluators who had previously assessed Thoma's condition and ability to return to work." No. 17 Civ. 4389, 2018 WL 6514757, at *27 (S.D.N.Y. Dec. 11, 2018).

173.   Dr. Grattan makes only conclusory statements and vague allusions to the record in this case.

174.   Dr. Grattan states, for instance, that "[Ms. Ruble's] [r]estrictions are supported however mild as [her] ongoing findings are very mild in severity."

175.   Dr. Grattan further states, "[t]he medical evidence supports [Ms. Ruble] has the ability to sustain a full-time capacity within the limitations from 05/01/18 and forward, as there are no ongoing neurological features."

176.   The peer reviewers arbitrarily reached their opinions based on insufficient evidence or investigation.

177.   None of Liberty's reviewing physicians ever set forth any substantive reasons why Ms. Ruble's treating doctors' opinions were incorrect.

178.   Liberty never even addressed Dr. Khera's assessment from July 2018 stating Ms. Ruble had not been able to return to work, which she submitted with her Appeal.

179.   Liberty failed to consider all evidence in violation of federal regulations.

180.   Liberty failed to explain why it credited the physician reviewers over Ms. Ruble's treating physicians.

181.   The peer reviewers were not given the Plan or other important records for reaching its decision that Ms. Ruble could perform work.

182.   The peer reviewers never examined Ms. Ruble.

183.   Liberty engaged in other procedural irregularities, which it did to serve its own financial best interests.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

184.     On information and belief, Liberty engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

185.     On information and belief, Liberty intentionally and strategically denied Ms. Ruble's claim before the Any-Occupation transition occurred, because it knew it could utilize the new definition of Any Occupation Disability to justify yet again re-examining her claim in the event of a remand.

186.     Ms. Ruble alleges on information and belief that Liberty has a parsimonious claims handling history.

187.     Lincoln Financial Group announced on January 19, 2018 that it has entered into a definitive agreement to acquire Liberty's disability business. Upon completion of the transaction, Lincoln Financial will retain Liberty's Group Benefits business and reinsure Liberty's Individual Life and Annuity business to Protective Life Insurance Company.

188.     Ms. Ruble is informed and believes that Lincoln Financial's acquisition of Liberty influenced Liberty's claim termination rates, including its decision to terminate Ms. Ruble's claim.

189.     Ms. Ruble is informed and believes that Liberty intentionally terminated claims, including Ms. Ruble's, in advance of Lincoln Financial's acquisition of its disability business.

190.     Discovery into the acquisition and potential impact on Liberty's structural conflict of interest in deciding Ms. Ruble's claim is warranted in light of the acquisition.

191.     Liberty failed to conduct a "meaningful dialogue" regarding Ms. Ruble's claim.

192.     The Plan Administrator's summary plan description delegates discretionary authority to Liberty, but a plan administrator cannot delegate discretion to a claims administrator in a summary plan description ("SPD"), because an SPD is not the Plan, or even a component of it. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011).

193.     Moreover, even if the Plan properly conferred discretion to Liberty, discretion is not unambiguously conferred.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

194.    The USAA Comprehensive Welfare Benefits Plan SPD states, "the applicable insurer has been delegated the fiduciary functions for purposes of initially and finally determining eligibility for, and the amount of, benefits, including the initial determination and the review of denied claims . . . and is the Plan Administrator for purposes of those functions."

195.    In the "USAA Long-Term Disability (LTD) Benefit Program Summary Plan Description," however, the Plan Administrator is identified as the Executive Vice President of Human Resources for USAA.

196.    In yet another Summary Plan Description attached to a copy of the Policy that was disclosed to Ms. Ruble by USAA, the Plan Administrator is identified as USAA.

197.    Even if USAA properly delegated discretionary authority to Liberty, in light of Liberty's wholesale and flagrant procedural violations of ERISA, Ms. Ruble's claim should be entitled to *de novo* review. *See Halo v. Yale Health Plan,* 819 F.3d 42, 60-61 (2d Cir. 2016) ("when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless.")

198.    Under the de novo standard of review, to be entitled to benefits, Ms. Ruble need only prove by a preponderance of the evidence that she is disabled.

199.    Even under the abuse of discretion standard of review, Liberty abused its discretion, because its decision terminating Ms. Ruble's disability benefits was arbitrary and capricious and caused or influenced by Liberty's, its reviewing physicians', and its vendors' financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

200.    Ms. Ruble is entitled to discovery regarding the effects of the procedural irregularities and structural conflict of interest that infiltrated the claims handling process and also regarding the effects of Liberty's reviewing physicians', employees', and vendors'

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

1    financial conflicts of interest, biases, and motivations on the decision terminating Ms.

2    Ruble's LTD claim and other Plan benefits she received incident to her LTD award.

3    201.    Under the de novo standard of review, Ms. Ruble is entitled to discovery regarding,

4    among other things, the credibility of Liberty's medical reviews and Liberty's lack of

5    partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract*

6    *Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the de novo standard of review, new

7    evidence may be admitted regarding, among other things: "the credibility of medical

8    experts… [and] instances where the payor and the administrator are the same entity and the

9    court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d

10   1017, 1026-27 (4th Cir. 1993)).

11   202.    Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B),

12   and to applicable federal law, Ms. Ruble is entitled to recover all benefits due under the

13   terms of the Plan, and to enforce her rights under the Plan.

14   203.    Ms. Ruble is entitled to reinstatement of any other employee benefits that were

15   terminated, discontinued, or suspended as a result of the termination of her LTD benefits.

16   She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully

17   terminated.

18   204.    Pursuant to 29 U.S.C. § 1132(g), Ms. Ruble is entitled to recover her attorneys' fees

19   and costs incurred herein.

20   205.    Ms. Ruble is entitled to prejudgment interest on the benefits to which she is entitled

21   and on her damages at the highest legal rate until paid.

22                                **COUNT II**
                              **(Breach of Fiduciary Duty)**
23                        **(Liberty and the Plan Administrator)**

24   206.    All other paragraphs are incorporated by reference.

25   207.    Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates

26   ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided

27   that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

28   208.    Liberty is a fiduciary and owes fiduciary duties to Plan participants, including Ms.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

Ruble.

209.    The Plan Administrator is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Ruble.

210.    Under 29 U.S.C. § 1104(a), Liberty and the Plan Administrator are required to discharge their duties with the care, skill, prudence, and diligence under the circumstances that a prudent man or woman acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

211.    Under ERISA, which is founded in trust principles, Liberty and the Plan Administrator are required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary duty.

212.    In many ways throughout the administration of Ms. Ruble's claim, Liberty and the Plan Administrator breached their fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).

213.    Liberty targeted Ms. Ruble's claim, subjecting her to multiple unnecessary medical reviews, ignoring critical evidence, and basing its Denials on erroneous medical reports.

214.    Liberty's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty, because Liberty's claims handling was discharged imprudently and caused Ms. Ruble serious harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

215.    Liberty did not disclose unfavorable evidence it procured to support the Final Denial, which is a violation of federal regulations and a breach of fiduciary duty. *See* 29 C.F.R. § 2560.503-1(h)(4)(i)

216.    To the extent that Liberty's denial of benefits caused Ms. Ruble harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

217.    On information and belief, Liberty instructs and/or incentivizes certain employee(s) to terminate fully-insured LTD claims and appeals based on bias or its financial interests.

218.    Ms. Ruble is informed and believes that Liberty's employees are trained in administering claims in the best interests of Liberty, not Plan participants.

219.    Liberty demonstrated bias and malice against Ms. Ruble through its employees. Instead of fully and fairly reviewing the medical evidence, Liberty unreasonably denied Ms.

Ruble's claim based on unreliable evidence, such as Dr. Grattan's report.

220. Liberty's failure to act prudently and in the best interests of Ms. Ruble's is a breach of fiduciary duty requiring appropriate equitable relief following discovery of Liberty's conduct as it relates to Ms. Ruble's claim.

221. Ms. Ruble is informed and believes that Liberty has targeted claims under the Plan, including Ms. Ruble's, which is a breach of fiduciary duty.

222. On information and belief, Liberty breached its fiduciary duty to Ms. Ruble by terminating her claim in an effort to avoid its financial liability.

223. The Plan Administrator breached his or her fiduciary duties by failing to perform the fiduciary duties imposed by ERISA, including having plan documents that meet the statutory requirement, failing to monitor Liberty's claim handling, failing to insure Liberty performed its duties under the Plan, and failing to take prudent or appropriate corrective action.

224. Based on the facts of this case, Ms. Ruble has "other equitable relief" available to her in several forms, including but not limited to surcharge,[1] because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Ms. Ruble whole for her losses from Liberty's and the Plan Administrator's breaching conduct.

225. The Court has broad discretion to fashion appropriate relief to make Ms. Ruble whole and should mold the relief necessary to protect the rights of the participants.

226. Ms. Ruble is entitled to injunctive or mandamus relief under 29 U.S.C. § 1132(a)(3).

227. She is entitled to enjoin any act or practice by Liberty and the Plan Administrator that violates ERISA or the Plan, and to seek other appropriate equitable relief that is traditionally available in equity.

228. Because of Liberty's breach of fiduciary duties to Plan participants, and because of the Plan Administrator's failure to appropriately monitor Liberty and protect Plan

---

[1] A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

1 participants and beneficiaries from Liberty's breaching conduct, the Plan Administrator

2 should be enjoined from employing Liberty as its insurer on LTD claims. The Plan

3 Administrator should further be required to implement appropriate procedures in oversight

4 of Liberty and/or any other insurers of LTD benefits under the Plan, which would maintain

5 accountability for the administrative responsibilities it seemingly freely delegates to Liberty.

6 229.   Ms. Ruble relied on the Plan Administrator and Liberty to her detriment.

7 230.   Ms. Ruble was actually harmed by the Plan Administrator's failure to oversee

8 Liberty's conduct.

9 231.   Liberty was unjustly enriched as a result of its breach of fiduciary duty violations,

10 because it wrongfully withheld Ms. Ruble's benefits for its own profit.

11 232.   Liberty engaged in several procedural violations in an attempt to circumvent its

12 obligations under ERISA, which is conduct the Court can enjoin.

13 233.   Liberty failed to provide unfavorable evidence it generated on review Ms. Ruble's

14 Appeal, for instance.

15 234.   The Plan Administrator failed to perform his or her fiduciary duties under ERISA

16 and the Plan.

17 235.   Liberty acted with malice and in bad faith against Ms. Ruble, which constitutes a

18 violation of its fiduciary obligations.

19 236.   ERISA "does not elsewhere adequately remedy" the injuries caused to Ms. Ruble's

20 by Liberty's and the Plan Administrator's breach of fiduciary duty violations.

21 237.   As a direct and proximate result of the breaches of fiduciary duty, Ms. Ruble

22 suffered actual, *significant* financial harm and has incurred financial expense.

23 238.   Ms. Ruble has depleted her savings account after Liberty terminated her LTD

24 benefits.

25 239.   Once Liberty terminated Ms. Ruble's LTD coverage, she was no longer able to

26 receive her medical insurance through USAA at cost.

27 240.   Ms. Ruble's monthly insurance premiums more than doubled, adding additional

28 financial strain.

241.   Ms. Ruble incurred additional credit card debt to cover monthly expenses.

242.   Ms. Ruble has had to rely upon her children for financial support, which she needs to buy basic necessities.

243.   Ms. Ruble is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid in full.

244.   Pursuant to 29 U.S.C. § 1132(g), Ms. Ruble is entitled to recover his attorneys' fees and costs incurred herein.

**WHEREFORE**, on all claims, Ms. Ruble prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A.   All past LTD benefits under the terms of the Plan;

B.   Clarifying and determining Ms. Ruble's rights to future benefits under the terms of the Plan;

C.   For any other benefits Ms. Ruble may be entitled to receive under the Plan due to her Disability;

D.   All other equitable relief that is proper as a result of Liberty's and the Plan Administrator's breaches of fiduciary duties;

E.   An award of Ms. Ruble's attorneys' fees and costs incurred herein;

F.   An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

G.   For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 28th day of June, 2019.


OBER PEKAS RONSTADT


By: *s/ Erin Rose Ronstadt*
    Erin Rose Ronstadt
    Clayton W. Richards
    *Attorneys for Plaintiff*

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745